Good morning. May it please the Court, I would like to focus my argument this morning on three issues that flow directly from the scope of the asserted claims and which require the conclusion that they are invalid as a matter of law, and those are failure to comply with the written description requirement of Section 112 for the full scope of the claim, failure to comply with the enablement requirement of Section 112 for the full scope of the claim, and the unlawful preemption of all practical uses of a natural principle in violation of Section 101. Now the failure to comply with the written description requirement flows from the contrast between the incredible scope of these claims, which encompass any and all means of reducing NF-kappa B activity in any and all eukaryotic or human cells, contrasted with the description of the actual structures of agents that are suitable for that purpose in the specification. There really aren't any. Instead, such agents are prophetically described by reference to the hoped-for function that they would have, inhibitor molecules, dominantly interfering molecules, decoy molecules, rather describing them by what they do rather than by what they are. But I think the other side responds, do they not, that it depends on, I mean, it depends on where the pathway starts, and that's the distinction that's drawn in the spec. Well, it matters not really where the pathway starts. The manipulative step here, which is the reduction of NF-kappa B activity, is not limited in any way in terms of how it is done. It can be done by chemical agents. It can be done by physical manipulations, none of which are described. It can be done by, I gather, heat treatment, none of which is described. The patent, when the trial judge looked at it, she said, gee, it discloses what the result is, but it doesn't tell you what the method is. And that's exactly the problem. There's no manipulative step in the claim. There is a requirement for attaining a function, and completely unlimited in that regard. Your view that the result is, what, the inhibition of the NF-kappa B? The result is the reduction of NF-kappa B activity, and there's a cascade of events which necessarily and inevitably flows from that, which is NF-kappa B binding to the gene. The gene it works with is limited, and expression of that gene is reduced. Is the result the inhibition of NF-kappa B, or is the result the reduction in the production of proteins as a consequence of the inhibition? They are one and the same, Your Honor. When one achieves the result of reducing NF-kappa B activity, one reduces that downstream cascade of events. The expression of protein, yes. And the problem with the claim is, it covers absolutely every way you can possibly imagine of doing that. And when you look at the specification for how you're supposed to do that, you see a functional description. Well, if you could make this, this would do it. If you could make that, that would do it. If it had that function, and we know from Fears, Lilly, and Enzo, that that's not enough. If you're relying on function, you need some correlation between the function and the structure. And there's nothing in the patent, there's no correlation given between structure and function, because there isn't any. Indeed, when you look at the prosecution history, Dr. Baltimore himself submitted a declaration precisely for the purpose of showing how structurally diverse these molecules are that have this function. And indeed, the expert testimony at trial from both sides was in accord with that, as we pointed out in our brief. Now, what happens in that circumstance? We have guidance for exactly this kind of process. Rochester, Alonzo, and the Carnegie Mellon case, all processes involving use of undescribed materials, and Rochester tells us that simply giving some way by which you might find them is not enough. And Alonzo says giving a way you might find them and giving one concrete example isn't enough to describe a densely populated genus. And Carnegie Mellon actually provides the rule of decision for this case. It says when the genus encompasses substantial variation, as this one does by Dr. Baltimore's own admission, when it encompasses substantial variation, what's required is a description of actual species that are sufficiently diverse, a sufficient variety to represent the variety encompassed by the genus. And since the genus is unlimited, that is legally impossible to do. Now, the claim construction issue isn't before us, but was Lilly at least initially advocating a claim construction that was narrow enough so that the written description requirement would have been satisfied? No, Your Honor. Our contention from the day the suit was filed was that these claims were facially invalid, and we've been looking for that legal determination ever since and have never gotten it. It's simply never been passed on by the trial judge, and this court will be the first one to actually address the issue. Now, they have a novel argument in response. They contend, gee, we don't need to describe agents because we don't use the word agents in the claim. And, Your Honors, that's by design. The claims right before they were allowed required the use of agents, just like Rochester, and they had been consistently rejected for lack of a written description under this court's authority. But then they were allowed. They were allowed because, inexplicably, I submit, Your Honor, because the word agents was removed, but that broadened the claim. That did not exclude agents from the claim. It left agents within the claim, and it left all these other undescribed techniques within the claim. And, indeed, the claim is almost indistinguishable from that that was struck down in O'Reilly v. Morse. Morse claimed use of electromagnetism, however developed, to print characters at a distance. And Ariad claims reduction of NF-kappa-B activity, however developed, to reduce gene expression. And the Lizard Tech case, which we contend is controlling on this issue, cites O'Reilly v. Morse as an example where the written description is not commensurate in scope with the claim and results in a finding of invalidity. And we contend that precisely the same result should apply here. Mr. Lipsy, would you address the enablement issue? Certainly. The enablement issue flows directly from the same set of facts. The claims cover every conceivable means of achieving a result. And since the time of O'Reilly v. Morse, courts have recognized that by definition and necessarily such a claim must encompass things which the inventor has not yet invented and did not describe. And this court's predecessor in In re Hyatt, citing O'Reilly, dealing precisely with this issue, recognized that as a problem under 112, first paragraph, where the enabling disclosure was not commensurate in scope with the claim. Why? Because the disclosure in such circumstances is necessarily finite and the scope of the claim in such circumstances is limitless and infinite and there must as a matter of law be a non-correspondence between those. And that's why single means claims have forever been viewed as unpatentable. Of course, if the claim were an article claim or a composition claim, the disclosure of an example might very well be sufficient and might satisfy the enablement requirement, even though the claim might be much broader than the single embodiment disclose. Why is there a difference in the context of this method claim? Well, when you're dealing with an article, a finite article, and the classic example is the CellPro case, which was a monoclonal antibody specific to an antigen. And the applicant disclosed three ways of making that antibody and there was some dispute about whether some of them worked, but there was no dispute that one of them worked. There was a way of making the antibodies encompassed by the claim. That one mode enabled practice of the invention throughout its full scope. And under that circumstance, you're exactly right, Your Honor. One way of making an article is sufficient to support a claim directed to that article. But it is not the law that if whatever mode is described is not sufficient to enable practice of the invention throughout its full scope, that that's sufficient. And that line of cases of VEC in the PGS case and the Monsanto Syngenta case all pretty well show that, that if you have two modes, and some of which are enabled and some of which aren't, you have the same problem under 112. Lack of correspondence between the enabling disclosure. But if I claim a method of sterilizing objects by dunking them in boiling water and the spec describes every kind of stove there is, and subsequently there's a microwave invented which boils water, and I haven't described anything about the microwave, does that mean my claim isn't enabled? Not at all. And the court has focused on the distinction between predictable technologies and unpredictable technologies. It has been the law, not so much the law, but the fact that in relatively simple predictable technologies, the Tillman case they cite as an example, very simple process, mix fat with water, heat, at high temperature under pressure. That is a process which once you describe it, one can immediately envision a whole variety of ways of doing it. And classically in those predictable technologies, the disclosure of one embodiment is sufficient to enable practice of the invention broadly, as it was in Tillman and as it would be in your example. The difference here is these claims are directed to a whole family of methods, a whole family. Inhibiting NF-kappa B by gene therapy, which they claim is possible by introducing this high kappa B molecule, which they had wrongly identified in the spec, is a different method from administering a small molecule drug, Yvista, for treatment of osteoporosis, which they claim is also covered by the patent. So we have a legal, so enablement, how we describe enablement as a legal matter is predicated on the technology or the science that underlies the method claim that we are dealing with? No, the articulation of the standard is always the same. The enabling disclosure must be technologies will vary depending on the predictability of the technology as one moves from what is disclosed to the penumbra about it of what's not. And here the testimony is unambiguous that if you have one small molecule that inhibits NF-kappa B, it doesn't tell you anything about whether the next small molecule will or what structural features are required to do it. And it's that kind of unpredictability where you have a diverse genus that you have to have enough examples throughout the scope of the genus to establish a scope of enablement can insert with its scope. Mr. Lipsy, you're into your rebuttal time, and I know you wanted to discuss 101, and we certainly wouldn't want to foreclose that opportunity. So I give you a few minutes to discuss section 101, and I will restore your five minutes of rebuttal. Thank you, Your Honor. I appreciate that. Don't take advantage of my generosity, however. It's a fundamental principle of nature that the reduction of NF-kappa B activity in cells reduces the expression of genes that it regulates. That's a law of nature. It happened for millennia. They may have discovered something about it, but it's always been there, and that's always the way it's been. And the claim that they've got actually preempts all practical applications of that principle. Why? Because the applications that are of interest are the ones in human medicine, and it preempts all uses of that principle in all human cells. Now, it is tantamount to a patent on the natural principle itself, and again, O'Reilly v. Morse provides the rule of decision, because there, in the Bilski case, this court recognized O'Reilly as holding ineligible for patent protection a claim preempting all uses of preempting all reductions of NF-kappa B activity to reduce gene expression. It, to me, seems directly analogous. Even under the Bilski test, this method does not bring about a particular transformation of a particular article. It is not limited to a particular or specific use. Well, how can you say it doesn't bring along a particular transformation? It seems to me that the reduction of NF-kappa B, which causes anti-inflammation, is very much a transformation. It may be a transformation. It is not a particular transformation, just as Morse's printing of characters. I don't understand. Well, Morse printed characters. He didn't print any particular characters. He didn't print them any particular way, and the fact that he purported to claim a method of printing characters no more restricted that to a particular application so that it wasn't a preemption of the whole idea than the limitation in this claim of restricting the use to reducing NF-kappa B to reduce gene expression. That's what reducing NF-kappa B does. That's the only environment in which it exists and operates. The limitation in the claim doesn't prevent it from preempting all practical uses, and indeed, I think the Bilski court recognized that limiting the preemption to a particular field of use doesn't solve the problem. So anyway, we believe that the same fundamental facts basically indicate the invalidity of the claim under all three conditions. We'll rely on our brief for the remaining issues. Thank you. Thank you, and we will restore your five minutes, and just to balance things out, we'll start out with 20 minutes on the clock for the other side. Mr. Rabinowitz? May it please the court. Good morning. The inventors of this patent discovered a previously unknown way of regulating a cell's response to external influences, namely by reducing NF-kappa B activity, one of thousands of transcription factors that exist in the cell, and they disclosed multiple classes of compounds that can be used for this purpose. Now, in the briefs and in argument, it's been contended that there was no such disclosure. If you would, let me take you to the patent and show you how much they disclosed, and in the patent at column 37, this is page A467 of the joint appendix. Table 2 relates to one class of compounds called decoy molecules, and in column 37 at the paragraph beginning in 950, the inventors explain what a decoy molecule is. This protein NF-kappa B binds to a particular type of DNA sequence. That's how it knows what gene it is. A decoy molecule is a piece of DNA that has the sequence recognized by NF-kappa B, but because it's just a small piece of DNA unconnected with a gene, the NF-kappa B, instead of binding to a gene, will bind to the decoy molecule. But even if we accept your argument with respect to the decoy module, the claims are broad enough to cover not only the decoy module, but inhibitor modules and interfering modules as well. Isn't that a problem? Well, Your Honor, we think that, so I'd like to come back to Table 2, if I may, and just show how it provides not only 10 specific examples of the sequence, but also... I mean, feel free to finish your argument with respect to Table 2, if you'd be more comfortable with that. But, Your Honor, let me deal with the question. This is... So, they described decoy molecules, they provided sequences for doing that, they described inhibitors, they provided an example and a screen for that, they described dominantly interfering molecules. This is more than the disclosure that Bell gave in the telephone cases. The claim at issue in the Bell patent was directed to an apparatus and method, essentially for transmitting speech by modulating a continuous electric current. And the issue there was, Bell pointed out two general ways of doing it. One was called the Magneto method, the other was called the Variable Resistance method. And the court held, and this is on page 538 of the Bell opinion, that, that, that the Bell had described only one type of apparatus, an apparatus for performing his claimed method by the Magneto method. And so the, and so they held that the apparatus aspect of that claim, it was treated as though it were two separate claims, the apparatus claim must be limited to a Magneto apparatus. He hadn't described a Variable Resistance apparatus and couldn't claim it. So that was the holding. And, and the assertion in Lillie's reply brief that Bell described. Where is the molecule structure disclosed for the inhibitor, for the interfering? Where in the patent will I find that? There is one example given, ICAPA-B, and at column 16 of the patent, at the paragraph beginning line 11, they reference a recent publication by these inventors where they had described partial purification of ICAPA-B. So that was one example of a specific inhibitor which the patent describes by referencing a publication. And then the patent provides. And you think that, that constitutes disclosure of the molecule? That constitutes, that constitutes written description of one, one molecule which can be used. But that, that's why, why I want to focus on the Bell case. Bell was permitted, the court held that although he had not described. Where, so this is the only thing there is, just so I know, I want to make sure I'm not missing anything in the patent, is the only thing there is for the written description support for the molecule that would fall into the inhibitor class. Because you identify three separate classes which you say are disclosed in the patent. And this is the sum total of what there is for this. There are three different ways disclosed, three different modes of using NF-CAPA-B. And as, as to inhibitors, this is a specific inhibitor described in terms by referencing the publication. The, and the patent provides screens for identifying additional inhibitors. But how, how is this enabled? This inhibitor, I mean are, are you arguing that this disclosure plus the level of skill in the art at the time? Because I, I understand this to be a truly pioneering patent. And, and it's clear that they invented something. I mean no one even knew what NF-CAPA-B was when this came along. There's no question about that. But how, given, this is the difficulty unfortunately for pioneering inventors is that enablement, unfortunately in the, those of skill in the art don't actually know much yet about something pioneering. So where is the enabling disclosure that would teach one how to use this in the claimed process? Your Honor, the, the enabling disclosure is in teaching that you can alter, you can modify the way a cell responds to its environment by one way, claimed here, reducing NF-CAPA-B activity and providing materials, namely decoy molecules that enable you to do that and pointing out additional ways to achieve that, just as Bill pointed out, an additional way to achieve telephony having provided only one type of apparatus. Can I, can I move back to written description? We're going back and forth it seems from written description to enablement. But on written description, it's my understanding that seeking shade on a sunny day and taking antibiotics do not infringe, in your view, the patent. That's correct, Your Honor. But that taking Avista and the other drug, what's the other drug? Zypress. Zypress do. What's the test for determining the difference between which methods fall into those, in your claims and which don't? Well, the test is whether they satisfy all the limitations of the claims and let me take you to, for example, Claim 7. And that's directed to a method for modifying effects of external influences on a cell. Since there are 200 claims, I mean, what column is that? I'm sorry, that's Column 82 on Page A for a blind example. Okay, I got it. Yes, okay. So Claim 70 supports Claim 80, which is, which was asserted against Avista and the other independent claims in question are Claim 9 and Claim 14. So these claims are directed to a method of altering the way the cell responds to a stimulus. So the cell is receiving a stimulus and it is responding in one way and then by application of this method, you change the way the cell is responding to the stimulus. You do that in the claims in suit here by reducing NF-kappa B activity, in other words, the NF-kappa B activity goes from an existing level to a lower level and the consequence of that, that must happen for the claim to be infringed. But why doesn't sunlight and antibiotics, why don't they do the same thing? Why wouldn't they be covered? Antibiotics don't change the way the cell responds to the stimulus. What they do is they remove the stimulus instead and that's a critical distinction. So in sepsis, you may have a bacterial infection, you can treat it with antibiotics, it will take some time until the bacteria go away and the stimulus is removed from the cell. In the meantime, patients often die. This is a completely different way of treating by not depending on removing the stimulus but changing the way the cell responds to the stimulus because you are interfering with the natural mechanism, NF-kappa B. So you are interfering with the expression of a protein within the cell? You are interfering, you are reducing NF-kappa B activity and thereby causing the cell to change its response, in other words, to alter its expression of proteins in response to the stimulus. So this does not read on the natural phenomenon. The natural phenomenon is what keeps us all healthy when we have infections. And normally that's a good thing because, you know, that's why it's evolved. It enables NF-kappa B activity normally enables us to mount responses to infections. When it goes awry, it is necessary to intervene and change that. And so these methods are directed at the object of the method is to, as Claim 7 says, modifying the effect of an external stimulus so that, the body of the claim says, NF-kappa B mediated effects of external influences are modified. And the way in which you do that is by reducing the activity of this one transcription factor which the inventors discovered, reducing NF-kappa B activity so that the cell will change the way it's responding. It will not express the proteins that it was expressing under the influence of the stimulus. It seemed to me there was some argument, at least in the context of inherent anticipation and infringement, as to whether the reduction in the activity of NF-kappa B was something that occurred outside the cell or within the cell. Did I, did I... The NF-kappa B activity... Am I correct in understanding that that was an issue that affected those two? I think what your honor may be referring to is the issue of whether the intervention must be outside the cell or inside the cell. Whether the, whether you intervene inside, our position is the claims do not require that you administer a compound which enters the cell. But... Well, if that's the case, isn't there an inherent anticipation problem? No, your honor, because what the claims require is that you alter the way the cell is responding to an external stimulus that is not the same as removing the stimulus. When the stimulus is removed, the cell is no longer responding to it. That's what happens in nature. What happens in these, the claims in suit here, are that the cell is being stimulated and you're changing the response. But isn't it the functioning of this invention that the NF-kappa B enters the cell and binds to those areas that express proteins that cause disease? NF-kappa B is always present in the cell. It's present usually in an inactive form because it's combined with its inhibitor called I-kappa B. When the cell receives a stimulus, that causes the cell, it sends a signal inside the cell which causes the cell to break down I-kappa B and that liberates NF-kappa B. So now you have NF-kappa B activity. The NF-kappa B travels to the nucleus and turns on certain genes. And this happens normally when persons are exposed to sunlight, correct? Sunlight can damage DNA and set this in motion. And the testimony was, this was elicited on a cross-examination from Dr. Maniatis, this persists as long as you're in the sunlight. When you go into the shade, it stops. So that's a reduction in activity. But not when the cell is being stimulated. It's after the cell has stopped being stimulated that the NF-kappa B reduces. These claims are a method for reducing NF-kappa B activity while the cell is being stimulated so as to alter the cell's response to the stimulus. And that language, and that's, you turn again for that proposition to Claim 7? Claim 7 says... Yes, so what is it that Claim 7 says that gets you to that point? It says a method for modifying the external effects of external, modifying the effects of external influences on the cell. And then it says the method comprising altering NF-kappa B activity in the cells, and Claim 8 makes that reducing, such that NF-kappa B mediated effects of external influences are modified. If there's no external influence anymore, you don't need to modify the cell's response to it. But Claim 95, which looks to me to be significantly broader than the claim that you keep pointing to, doesn't have any of these limitations that you're stressing now. I don't see language in Claim 95. Claim 95 depends from Claim 9. Claim 9 begins, a method for reducing in eukaryotic cells the level of expression of genes which are activated by extracellular influences. So the cell, there's an extracellular influence which is causing the cell to activate those genes. But that doesn't have anything to do with whether the stimulus... I just don't see how that ties together with everything that you've been saying here. The extracellular influence is the stimulus in question. The term in the claim construction, this is in the record at A324, the term activated by extracellular influences was stipulated to mean stimulated by one or more inducing substances outside the cell. So that's what that term means in that claim. So again, you have a cell which is being stimulated by one or more inducing substances outside the cell, and you're changing the way the cell responds. You're doing it by one way, reducing NF-kappa B activity. And the consequence is such that expression of said genes, that refers back to the preamble, the genes which are being activated by the extracellular influences, these external stimuli, expression of said genes is reduced. Isn't there external stimuli present when one administers an antibiotic to counteract the effect of that external stimuli? The antibiotic doesn't change the way the cell responds to the stimulus. What it does instead is it removes the stimulus. So this is a method for changing the cell's response to an existing stimulus. What antibiotics do is remove the stimulus instead. So I wanted to go back to the telephone case because I think it is important in controlling. Bell described, the object of Bell's claim, method claim, was a way of transmitting speech by varying a continuous electrical current in accordance with the vibrations of the voice. He pointed out two types of apparatus that could do it. He described only one, a magneto-apparatus. He mentioned, he speculated, about a variable resistance apparatus. The two holdings that are important in conjunction are, he was not entitled to claim variable resistance apparatuses. His apparatus claim had to be limited to a magneto-apparatus. But his method claim was not so limited. He provided a mode of performing his method in the way that he claimed it. Is all of that analysis in the context of a 101 type framework or a 112? You certainly look at different things for each of them. It is not completely identical and overlapping. That was in the context of 112. The court also addressed whether he was pre-empting all practical uses of the phenomenon. And it said, it rejected that as well. It said it may be that electricity cannot be used at all for the transmission of speech except in the way Bell has discovered. But that does not make his claim one for the use of electricity distinct from the particular process. So extrapolating from what you're saying, are you suggesting that the entire claim scope doesn't need to be described or enabled? Look at Bell as an example of where it wasn't done. I would say that you must enable the invention as you claim it, as you describe it in your claim. But you're unfortunately confronted by a lot of precedent that we have that says the entire claim scope needs to be enabled. Whether I agree with it or not, I'm bound by it. I certainly see some of the logic of what you're saying, but I'm wondering how I reconcile what you're saying with that precedent. Your Honor, through Eli Lilly, Rochester, all those cases say you must provide a written description of the invention as presently claimed with all its claimed limitations. Yeah, but I think Judge Moore was asking about enablement. In enablement, I'd like to refer to the Invitrogen case. The Invitrogen case was a case that concerned mutated proteins. But do you agree with the statement of law that the full claim scope must be enabled? All the cases that Lilly relies on literally recite in the claims a class which is generic and which is not fully enabled. Okay, but do you agree that as a legal proposition, the full claim scope, according to our precedent, must be enabled? You can then tell me you don't think that that's the situation here, but I'm just wondering, do you disagree with that statement of our existing precedent? That's a correct statement, but it depends on how it's applied to the claims. Because the claim scope here, the claim recites a way of changing a cell's response to a stimulus by reducing NF-kappa-B activity, and you must provide at least one mode of reducing NF-kappa-B activity. That is the scope of the claim. You do not have to describe all the possible compounds. This is your analogy to the composition claims and how enablement is satisfied by just providing one method of making a composition. Is that where you're going? That's correct. The analogy is you must provide one way of reducing NF-kappa-B activity. There is no different enablement requirement. Tell me where I'm wrong about this, though, because the difference there is the scope of the claim is the composition. So the full scope of the claim is in fact enabled because the scope is the composition. It's not the method of manufacturing. If that claim, in contrast, had covered every method of manufacturing, and you had only disclosed one, then you would have an enablement problem. And why isn't that your situation? Why isn't it you have claimed a method, a method of reducing NF-kappa-B? It is an incredibly broad claim. Why aren't you required to enable the full scope of it? Because this is the scope of your claim, the method of reducing this. The answer is this is not a method of reducing NF-kappa-B activity. It is a method of changing a cell's response to a stimulus. The way in which you achieve that is by reducing NF-kappa-B activity. If NF-kappa-B activity is reduced without causing the cell to change its response to a stimulus, there may be other applications people devise for that that would not fall within the scope of these claims. Okay, but you claim inhibitor. You claim at least four things are in fact covered by your claim, right? Decoy, inhibitor, what their client is doing, those particular methods, and then the third one, the fourth one I'm... That's incorrect, Your Honor. The claim is not directed to those as compositions of matter and it is not... Your claim covers the method of using those four different things for the purpose of reducing NF-kappa-B. I'm sorry, I thought this was stipulated to and not even being disputed in that case. You're claiming that your claim covers. It's a matter of characterization. The claim certainly embraces the use of any compound for altering a cell's response to a stimulus by reducing NF-kappa-B activity. I would disagree with characterizing that as a claim directed to the use of the compound. The object of the claim is to change a cell's response to the environment. The way in which that is done is to reduce NF-kappa-B activity in the cell and there are different means of performing it. The inventors provided a very detailed and enabling description of one class of those compounds that could be used to induce performance of the method and the method is not restricted to the use of NF-kappa-B. Is your position that the disclosure also provides enabling disclosures of the inhibitor? That was the testimony at the trial and the jury found the claims enabled. The experts testified that the screening assays at the time given the high level of skill in the art did permit others to go and identify inhibitors. And the interfering ones as well? Your position is that the level of skill in the art plus the disclosure and the patents enabled those as well? That indeed was the testimony to the jury. But I would point out that this court in Invitrogen said, and this is at page 1071 of the Invitrogen case, enablement does not require the inventor to foresee every means of implementing an invention. But this isn't to foresee, you actually call these out in your specification and give a clear hypothesis of their utility for this purpose. In other words, I think that under Invitrogen it would have been sufficient for the inventors to provide one practical means of performing this method, for example by providing decoy molecules as they did. The fact that they gave further description ought not to diminish from the scope of the claims that they're entitled to. But this may be a different situation because you're claiming a method of producing a certain result that encompasses virtually any way in which that result is achieved. Your Honor, there are thousands of different transcription factors. Interfering with any one of them could be a way of changing the way the manner in which a cell responds to a stimulus. These inventors confined their claims to what they had invented and described, namely the way which consists of interfering with NFKB. They provided at least one mode of achieving that. They had reduced it to a practical reality. This is not like Rochester, where it was stipulated there were no compounds disclosed that could be used to perform the method. Do you think this is distinguishable from automotive technologies and lizard tech? Yes. Both of those cases dealt with methods. They literally recited claim elements that were generic and were not enabled. These inventors, because they were writing on a blank slate, were able to define a novel way of altering a cell's response at a high level of generality. They were entitled to claim it as broadly as they contributed by providing one practical way of achieving what they claimed, just as Bell did. Had they not been such pioneers, they would have had to claim at a lower level of generality, putting more elements in the claim, and that would have triggered a corresponding duty to enable the full scope of whatever elements they had used to claim their invention. Mr. Rabinowitz, you have run over even your extended time, but I'll extend to you one minute to respond to the comments with regard to Bilsky. Your Honor, this is a method for transforming the state of living cells, which are compositions of matter. It is a traditional transformative process. It transforms cells, and it does not appropriate anything that exists in nature. The most important use of NF-kappa-B, which is the natural phenomenon, is what we all do in our everyday lives when we respond to infections. That's not affected by the claims. The transformation is the reduction in activity of NF-kappa-B? The transformation is changing the way the cell is responding to its environment. The way that's done is reducing NF-kappa-B. Before application of the invention, the cell is receiving a stimulus and is responding in one way. It's wired, if you like, in one particular way. You've now interfered with that mechanism and changed it. You've reduced the NF-kappa-B activity. The cell now responds in a different way, specifically by changing the way it turns its genes on. That is a transformation. All right. Thank you very much. Mr. Lipsy? Given that I have five minutes, I now wish Jason were here to respond to this. I'll do the best I can. Critical point. Written description and enablement are dictated by the scope of the claim. What's encompassed by it, not the words that are used in it. It's clear from Lizard Tech. Lizard Tech was a case where it was the very absence from the claim of any words describing how the method was to be done that caused it to run afoul of the written description requirement when there was no disclosure in the patent on how to do it generically. It has nothing to do with what the actual words are. The Bell case is an unexceptional case. I'll deal with it quickly. It had a special kind of claim. It was the old style claim that said a method of transmitting voice as described herein. There were two methods described in that patent. One was the magneto method. One was the resistance method. When it came to the method claim, the court said the method claim covered both of those. Both were described therein. That's all Bell held. It did not hold that you can disclose one method of inhibiting NF-kappa-B and claim all methods of inhibiting NF-kappa-B. Now turning to the disclosure, that table that you were referred to, Table 2, that is not the table of decoy molecules. When you read that, that's a table of binding sites that can be inserted into DNA to make a gene responsive to NF-kappa-B. That's what that table is. What you'd have to do to make a decoy molecule out of that is all kinds of manipulation to make something that would recognize those sites and then make it stable enough that it wouldn't be regarded as food by the cell into which it was inserted. There is no such description in the patent. The dominantly interfering molecules, which was the topic you were groping for, when you read it, it says... Groping is being polite. It says, if the binding site and the activating region of NF-kappa-B are distinct, then you might be able to make one. The patent didn't tell you whether that was the case or not. Indeed, a research project was required to do that. The identification of an impure isolate of I-kappa-B is not a disclosure of I-kappa-B for the very reason that this court held in Anjin-Vichugai that that wasn't even a conception of the DNA encoding it. In fact, I-kappa-B itself can't be used. It can't be gotten into the cell and recited in our brief the testimony that you can't get a big protein in the cell. Do you think decoy molecules are described in this patent? I do not believe they are. In fact, they are not. The fact of the matter is our arguments on 112, first paragraph, written description enablement, we win on that whether they are or not because there's so much else encompassed by the claim. What about the analogy to the composition claims that he raises, though? The notion that when you have a composition claim, you need only enable one method for... Certainly. And I understand that we dealt with that in the brief. When you claim a thing, you need only disclose a way of making a thing. If you claim a family of things, you must disclose a way of making all of the family. And when you claim... This claim is to a family of methods. It is a very broad genus of methods which basically reduce NF-kappa-B activity by any way you can possibly imagine. And when you claim that, you need to enable it. The court raised the question of Pioneer patents. The PGS case makes very clear there is no different standard of enablement for Pioneer patents. There may be a different standard of scope of equivalence. That's where the Pioneer patent comes into play in terms of claim scope. There is no exemption from the disclosure requirements even for Pioneer patents. Turning to the claims, this has been a recurring problem throughout this case, which is Ariad has repeatedly tried to read limitations into these claims, you know, in order to avoid the inherent anticipation problem, in order to be able to prove infringement. It's been somewhat of a moving target. The plain, ordinary meaning of those claims indicates that all you have to do is to reduce NF-kappa-B activity, whereby the response is altered. There's nothing in here that requires in the continuing presence of an inducer. They could have put that in the claim. In their zeal to preempt the future before it had arrived, rushing to get these claims out before the time expired, this was right... If they'd had to re-file it, they would have lost virtually all the patent term because of the GATT provisions. They made these claims as broad as all outdoors, and they have picked up the sword, and indeed must perish by the sword as a result of that. As Libel Florschein mentioned, it's indeed ironic... The claim 203 asserted against you, do you know? No. That's the decoy one. No, the decoy molecules, even if they are enabled, are irrelevant to the case. None of what we have is a decoy molecule. And the real problem is they contemplated drugs. If you look in column three of the patent, you'll see they mention drugs. And there is nothing in this patent that enables you to determine which drugs do this and which don't, which is in part the fundamental unfairness here. Our products are described in patents that were filed before this patent was ever filed. The drugs themselves were recognized and described for human use. And it's only subsequent tests after the products are fully in development that even reveals the fact that now we're charged with infringement. And that is one of the problems with claims like this that cover every possible means of obtaining the result. Very briefly, summing up? Summing up? I will sum up and thank the Court for its courtesy. Well, thank both counsel. This is a difficult and important case and the arguments have been very helpful, both the arguments and the briefs. We thank counsel. The case is submitted. Thank you.